Sue Ellen Tatter
Assistant Federal Defender
FEDERAL PUBLIC DEFENDER
FOR THE DISTRICT OF ALASKA
601 West Fifth Avenue, Suite 800
Anchorage, Alaska  99501
(907) 646-3400

Attorney for Defendant

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>vs.<br><br>DANIEL WAYNE PHILIP,<br><br>        Defendant. | Case No. 3:06-cr-00056-JWS<br><br>**MEMORANDUM IN SUPPORT OF FIRST MOTION TO DISMISS INDICTMENT** |

**I.      INTRODUCTION**

On June 20, 2006, a federal grand jury indicted Daniel Philip for a violation of 18 U.S.C. § 922(g)(8). The indictment alleged that on May 11, 2006, Mr. Philip possessed three firearms while he was "subject to a domestic violence restraining order." Mr. Philip does not have a felony conviction, nor does he appear to be otherwise prohibited from possessing firearms. The sole basis for the federal criminal charge is the state order.

The domestic violence restraining order, which the government provided in discovery, was dated January 30, 2006, and issued by Alaska Magistrate Suzanne Cole.

This order had been preceded by an ex parte restraining order issued on January 10, 2006.

The initial ex parte restraining order, including a domestic violence petition filed by Rebekah Bauer, is herewith attached as Exhibit A.  The final restraining order, which is the basis of the federal prosecution, is attached as Exhibit B.  The transcript of the hearing on the final restraining order is attached as Exhibit C.

The matter is now before the court on Mr. Philip's motion to dismiss the indictment with prejudice.  He makes three arguments.  First the Fifth Amendment due process clause precludes the government from relying on this domestic violence restraining order to establish a violation of 18 U.S.C. § 922(g)(8).  Second, 18 U.S.C. § 922(g)(8) violates the Tenth Amendment, on its face and as applied.  Finally, the statute violates the United States Constitution, Article I, § 8, clause 2, the Commerce Clause.

## II.    STATEMENT OF FACTS

### A.    Mr. Philip's Relationship to Rebekah Bauer

Mr. Philip married his high school sweetheart, Kari Herzog, in 2000.  They have two children, Daniel, 6, and Taylor, 5.  The Philips separated in 2002 and finalized the divorce in 2006.  They have shared custody of the children.  The parents have an amicable working relationship.

In November 2002, Mr. Philip met Rebekah Bauer in Sacramento, California.  They moved to Alaska in 2003 and lived together until July 2005.  In July 2005, Mr. Philip asked Ms. Bauer to move out.  She eventually did, although the couple still had some of

each other's property.  On August 4, 2005, when Ms. Bauer was leaving, she called the police for a "civil stand-by."  During the incident, Ms. Bauer started to take an entertainment system that belonged to Mr. Philip's children out of the house.  According to Mr. Philip, he told Ms. Bauer he would rather break the system with a "hammer" than see it leave with Ms. Bauer.  According to Ms. Bauer, Mr. Philip "threatened" her "with a hammer," although she did not say if this threat was verbal or physical.  In any event, the August 4 incident did not result in criminal charges or an immediate domestic violence petition.

On December 21, 2006, Ms. Bauer came to Baxter Terrace, where Mr. Philip now lived with his children and Denise Stewart, to return some property.  During this meeting, Ms. Bauer and Ms. Stewart got into a physical altercation.  Mr. Philip did not participate.

On January 10, 2006, citing only the incidents of August 4 and December 21, 2005, Ms. Bauer obtained an <u>ex parte</u> domestic violence restraining order against Mr. Philip.

### B. The DV Hearing and Order

The hearing on Ms. Bauer's petition was held January 30, 2006, before Magistrate Cole.  Both parties brought witnesses, who were sworn.  No one was represented by counsel.

The magistrate indicated that she did not want to hear about the two incidents alleged in Ms. Bauer's DV petition.  Rather, the magistrate focused on testimony from Stacy Phelps, a friend of Ms. Bauer.  Ms. Phelps stated that Mr. Philip had made a telephone threat about Ms. Bauer to Stacy Phelps on January 16, 2006.  Mr. Philip

disputed Ms. Phelps' version of the call. However, the magistrate refused to hear from Denise Stewart, Mr. Philip's witness, who was present during the call and heard his portion of the conversation. The magistrate issued an order restraining Mr Philip. The entire hearing took 23 minutes.

### C.   State and Federal Charges

On May 11, 2006, police arrested Mr. Philip at his home for misconduct involving a weapon. The charges followed Mr. Philip's discharge of a gun at 3:00 a.m. After several area burglaries, and Denise Stewart telling him there was someone at the door, Mr. Philip went to the door and fired a gun near the intruders. He thought they were burglary suspects, but they were actually newspaper delivery people. However, Mr. Philip and his two adjacent neighbors do not subscribe to the newspaper, so he reasonably feared that crime was afoot.

Mr. Philip remains charged in state court for the firearms discharge. However, he was also charged in federal court with gun possession while under a domestic violence restraining order.

## III.   ARGUMENT

### A.   The DV Order Cannot Be the Basis of Criminal Sanctions Because the Hearing Procedure Lacked Due Process.

The law prohibits certain persons from possessing weapons. In the case of the prohibition for felons, there is significant due process built into the prohibition – notice of criminal charges, an attorney, constitutional rights, proof beyond a reasonable doubt, and appeal. In the case of persons subject to a domestic violence order, there is

insufficient due process for the prohibition in this case. The magistrate surprised Mr. Philip with a new charge, refused to hear his relevant witness, failed to warn him orally about firearm possession, and issued an order restraining him for a year – all within 23 minutes.

Mr. Philip respectfully submits that the Fifth Amendment Due Process Clause does not allow the government to base its indictment on this order for four reasons. First, he was not advised before the Anchorage hearing that his right to possess weapons anywhere in the United States was at issue at the domestic violence hearing. Second, he was not given notice nor a full and fair opportunity to be heard regarding Ms. Bauer's, and particularly Ms. Phelps', allegations. Next, he was never advised that he could appeal from an adverse ruling or otherwise seek modification of any order entered against him. Finally, the evidence presented at the state DV hearing was insufficient to sustain a finding that he had committed a crime of domestic violence against Ms. Bauer.

### B.    Mr. Philip was Entitled to Due Process at the January 30 Hearing.

It is axiomatic that the Fifth Amendment due process clause constrains the government's ability to deprive individuals of "liberty" or "property." Mathews v. Eldridge, 424 U.S. 319, 332 (1976). This constraint at its core embodies principles of fair notice and warning. Armstrong v. Manzo, 380 U.S. 545, 550 (1965). The "right to be heard before being condemned to suffer grievous loss of any kind, even though it may not involve the stigma and hardships of a criminal conviction, is basic to our society." Matthews v. Eldridge, 424 U.S. at 333, quoting Joint Anti-Fascist Refugee Comm. v. McGrath, 341 U.S. 123, 168 (1951) (Frankfurter, J. concurring).

C.  **The Government May Not Base a Criminal Sanction on a Civil Order Which Violated Due Process**.

In United States v. Mendoza-Lopez, 481 U.S. 828, 834 (1987),[1] the Court evaluated whether a federal court must always accept as conclusive the lawfulness of a civil order, even if the hearing which produced the order was not conducted in conformity with due process. Although the Mendoza-Lopez court was evaluating a civil order used to obtain a criminal sanction in an unlawful reentry case, the rationale applies here. The Mendoza-Lopez court explained.

> Our cases establish that where a determination made in an administrative proceeding is to play a critical role in the subsequent imposition of a criminal sanction, there must be some meaningful judicial review of the administrative proceeding. This principle means that where the defects in an administrative proceeding foreclose judicial review of that proceeding, an alternative means of obtaining judicial review must be made available before the administrative order may be used to establish conclusively an element of a criminal offense.

Id., 481 U.S. at 837-38 (citations and footnotes omitted).

In Mendoza-Lopez, the respondents were charged with unlawful reentry after deportation in violation of 8 U.S.C. § 1326. Each contended that their deportation hearing was fundamentally unfair because the immigration judge failed to adequately explain their right to apply for suspension of deportation *and* their right to appeal from an adverse ruling on their request for suspension of deportation. Id., 481 U.S. at 832. Both the district court

---

[1] The reach of Mendoza-Lopez was affected by the passage of 1326(d) of Title 8, which codified certain due process rights in the immigration context. See United States v. Lopez, 445 F.3d 90, 94 (2d Cir. 2006). However, the Supreme Court's interpretation of due process rights in general, and their impact on future criminal cases, as discussed in Mendoza-Lopez, remains the law of the land.

and the United States Court of Appeals for the Eighth Circuit agreed. Id. Because these due process errors rendered the deportation hearings fundamentally unfair, the Supreme Court affirmed the lower court analysis and ruled that the resulting deportation orders could not be used to prove § 1326 unlawful reentry violations.

Mendoza-Lopez is analogous to Mr. Philip's case. If a statute allows imposition of a criminal penalty for any domestic violence order, the Fifth Amendment requires that the domestic violence hearing procedure meet due process standards. If it does not, the resulting domestic violence order cannot be used to form the basis for a criminal prosecution.

### D. The Government Cannot Use the DV Order Because the Hearing Did Not Comply With Fundamental Due Process Requirements.

#### 1. Notice

The DV hearing in this case did not provide even minimal due process. Mr. Philip went to the hearing with no notice of the charge of making a threatening phone call. He had no idea that his future right to possess a firearm in Alaska could be affected by the DV proceeding.

For more than a century, the central meaning of procedural due process has been clear. Parties whose rights may be affected are entitled to be heard. However, they must first be notified about what is at issue so that they may adequately enjoy this right. Fuentes v. Shevin, 407 U.S. 67, 80 (1972).

The magistrate failed to provide any advance warning of the "telephone charge" allegation. This allegation came up at the hearing for the first time and surprised Mr. Philip. Further, the magistrate did not warn Mr. Philip about a potential effect on his

right to possess firearms. These notice problems violated fundamental notions of due process. This violation prohibits the government from relying on the resulting domestic violence order in this prosecution.

> **2.    Right to be heard at a meaningful time and in a meaningful manner**

The magistrate in this case heard from Stacy Phelps, a friend of the petitioner, about a telephone call which was not even alleged in the domestic violence petition. However, the magistrate refused to hear from Mr. Philip's witnesses, including Denise Stewart.

> THE COURT: I'm not going to hear from either witness. Regarding the phone call on January 16th, was anyone there listening on the phone?
>
> MS. PHELPS: No.
>
> MS STEWART: I was . . .
>
> THE COURT: I'm not hearing it. Thank you anyway sir . . .
>
> MR. PHILIP: Denise was – was there present at that time.
>
> THE COURT: On the phone?
>
> MR. PHILIP: No, I was on the phone and she was present in the room at that time when the conversation took place.
>
> THE COURT: . . . Ms. Bauer, anything else?

Transcript of January 30 hearing, pp. 14-15.

Procedural due process includes the right to be heard in a meaningful manner. <u>Armstrong v. Manzo</u>, 380 U.S. at 552. In this case, the magistrate did not permit

Mr. Philip to test Ms. Phelps' statements by cross-examination. Nor did the magistrate permit Mr. Philip to offer a rebuttal witness – Denise Stewart – who was present in court, sworn and who could contradict Ms. Phelps' version of what Mr. Philip said. Ms. Stewart was a crucial witness available to challenge the veracity of Phelps' claims. The opportunity for confrontation and the opportunity to present defense witnesses are essential components for any system of dispute resolution which complies with the constitutional requirement of due process.

These essential components of due process simply are not evident at the magistrate's proceeding which produced the domestic violence order the government expects to rely on in this case. These due process failures preclude the use of the domestic violence order to prove the indictment.

### 3. Appeal and/or modification

The error which occurred in <u>Mendoza-Lopez</u> was repeated in this case. The record establishes that the magistrate failed to inform Mr. Philip that he had the right to appeal from an adverse ruling or that he could otherwise seek a modification of any order entered against him.

### 4. Sufficiency

Finally, the evidence presented before the magistrate on January 30, 2006, is simply not sufficient to sustain the finding that "act(s) of domestic violence or abuse has occurred and may occur again." Even if Stacy Phelps is to be believed (which is unfair in light of the magistrate's refusal to permit her testimony to be cross-examined or rebutted), Mr. Philip simply made indirect, general statements which Ms. Phelps interpreted as

immediately threatening. On this record, there is simply no basis to credit one side or the other. Consequently, the government cannot, consistent with due process, rely on the domestic violence order as a basis for its § 922(g)(8) prosecution.

  **E.**  **Title 18 U.S.C. § 922(g)(8), On Its Face And As Applied, Violates The Tenth Amendment**.

  The Tenth Amendment mandates that "[t]he powers not delegated to the United States by the Constitution nor prohibited by it to the States, are reserved to the States respectively, or to the people." United States Const. amend. X. Our national government is one of the enumerated powers that were purposely designed to be limited in scope. <u>Gregory v. Ashcroft</u>, 501 U.S. 452, 457 (1991). The Tenth Amendment restricts Congress's ability to infringe upon state sovereignty and strikes a balance between state and federal power. <u>New York v. United States</u>, 505 U.S. 144, 156-60 (1992). The framers of the Tenth Amendment explicitly intended that the several states retain sovereign authority within the newly created federal system. As James Madison explained:

> "The powers delegated by the proposed Constitution to the federal government are few and defined. Those which are to remain in the State governments are numerous and indefinite . . . The powers reserved to the several States will extend to all the objects which, in the ordinary course of affairs, concern the lives, liberties, and properties of the people, and the internal order, improvement and prosperity of the State." The Federalist No. 45 pp. 292-93 (C. Rossiter ed. 1961) (J. Madison).

<u>Gregory v. Ashcroft</u>, 501 U.S. at 458. One of the overriding purposes of this explicit restriction on federal power was to reduce the risk of abuse by a remote federal government. <u>Id.</u> at 458-59.

Section 922(g)(8) ignores the central importance of federalism because it directly frustrates the sovereign state's right to regulate its citizens on matters of strictly local concern. The Supreme Court has long disfavored federal interference in matters traditionally left to the states. See, e.g., Brecht v. Abrahamson, 507 U.S. 619 (1993); Engle v. Isaac, 456 U.S. 107 (1982); Younger v. Harris, 401 U.S. 37 (1971); Byrne v. Karalexis, 401 U.S. 216 (1971).

For over two hundred years, regulation of domestic relations matters has been left to the states. Federal courts have respected this traditionally local concern and have avoided involvement. See, e.g., Simms v. Simms, 175 U.S. 162 (1899) (domestic relation matters are resolved by state law not federal law); Ankenbrandt v. Richards, 504 U.S. 689, 691 (1992) (same). Although § 922(g)(8) may not, on its face, address state domestic dispute resolution, it substantially interferes with a state's ability to carry out its traditional function in this critical area of the law.

Section 922(g)(8) can have a directly chilling effect on the issuance of protective orders by state court judges. A state judge whose former practice had been to issue domestic violence orders to "play it safe," may now require the petitioner to meet a higher standard because of the automatic restriction imposed by § 922(g)(8). The judge now may elect to issue fewer protective orders. This is especially true in borderline cases where, for example, the threat of deadly violence is minimal, or where firearm possession is essential to the respondent's livelihood. A state judge might not be inclined to issue an otherwise meritorious domestic violence order where the respondent is a member of the State National Guard or serves as a police officer or a security guard. The effect of

§ 922(g)(8) on Alaska's sovereignty is especially dramatic when large portions of the state's population depend on subsistence hunting to support themselves and their families.

Many states, including Alaska, have statutes which recognize that firearm possession can be permitted while a domestic violence protective order is in effect. See, e.g., Alaska Stat. § 18.66.100(c)(6) (which permits but does not require the suspension of firearm possession rights during the pendency of a domestic violence protective order). See also KRS 403.750 (the Kentucky domestic violence statute which does not condition issuance of a protective order on a firearm restriction). These statutes permit a judge to exercise his or her discretion and to restrict firearm possession as necessary to accommodate the various interests described in the preceding paragraph. By criminalizing an otherwise legal activity, § 922(g)(8) absolutely eliminates state court discretion and federally mandates an election between granting a domestic violence protective order with its automatic firearm prohibition and denying a domestic violence protective order because the automatic firearm prohibition is either unreasonable, unnecessary, or unworkable.

Obviously, a local judge is far better equipped to evaluate the need for a firearm restriction when ruling on a domestic violence petition than the national government. A restriction which makes sense in New York City may be impractical or unnecessary in the wilds of Alaska. Restricting discretion in a matter traditionally recognized as local in nature infringes on state sovereignty and violates the Tenth Amendment. Cf. Printz v. United States, 521 U.S. 898 (1997); New York v. United States, 505 U.S. 144 (1992).

Printz illustrates the point well. There, the Supreme Court declared the Brady Handgun Violence Protection Act unconstitutional because it infringed on state sovereignty by requiring local law enforcement to perform background checks on citizens seeking to purchase handguns. Printz held that Congress may purport to act pursuant to its Commerce power and still violate the principle of state sovereignty under the Tenth Amendment. Section 922(g)(8) is constitutionally defective for the same reason. State judges in practical effect must impose a firearm restriction or forego entering the protective order.

For all these reasons, 18 U.S.C. § 922(g)(8) violates the Tenth Amendment. Consequently, the indictment in this case must be dismissed.

### F. Title 18 U.S.C. § 922(g)(8) Represents An Unconstitutional Exercise Of Congress's Commerce Power.

Title 18 U.S.C. § 922(g)(8) represents an unconstitutional exercise of Congress's power under the commerce clause for two reasons. First, the conduct it outlaws does not substantially affect interstate commerce. Second, § 922(g)(8) as applied in this case transforms the commerce clause into a general police power.

> . . . it seems to me that the power to regulate "commerce" can by no means encompass authority over mere gun possession, any more than it empowers the federal government to regulate marriage, littering or cruelty to animals, throughout the 50 states. Our Constitution quite properly leaves such matters to the individual states. . . .

United States v. Lopez, 514 U.S. 549, 585 (1995) (Thomas, J., concurring).

The commerce clause empowers Congress "[t]o regulate commerce with foreign Nations and among the Several States and with the Indian Tribes." United States

Const. art. I § 8, cl.3. § 922(g)(8) exceeds Congress's legislative authority to regulate commerce under the commerce clause. It does not authorize the congressional exercise of national police power. Id., 514 U.S. at 584.

### 1.    Scope of commerce clause authority exceeded

The Supreme Court addressed the limits of the power given to Congress in United States v. Lopez, 514 U.S. 549 (1995). Lopez challenged Congress's use of its commerce power to enact legislation outlawing possession of a firearm within 1,000 feet of a school zone. United States v. Lopez, 514 U.S. at 522-23. The Court recognized three categories of activity which the national government may regulate under the Commerce Clause. Id. at 558. First, Congress may regulate the use of the channels of interstate commerce. Id. Second, Congress may regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though any threat to them may only emanate from intrastate activities which substantially affect interstate commerce. Id. Finally, Congress may regulate those activities which substantially affect interstate commerce. Id.

The Lopez Court quickly dismissed the first two categories as inapplicable to the facts before it and evaluated the challenged statute under the third category. Id. at 559. This category requires a determination of whether the regulated activity "substantially affects" rather than just "affects" interstate commerce. Id. In Lopez, the Supreme Court concluded that the Gun Free School Zone Act could not survive the "substantially affect" interstate commerce test. Id. at 561.

Here, just as in Lopez, the first two permitted areas of Congress's exercise of its commerce power are inapplicable. Possession of a firearm by a person who is subject to a domestic violence protective order does not relate to the use of the channels of interstate commerce. Likewise, the statute does not protect an instrumentality of, or a thing in, interstate commerce. Therefore, according to Lopez, the constitutionality of § 922(g)(8) must turn on the regulation of an activity which substantially affects interstate commerce.

In Lopez, the Supreme Court noted that the Gun Free School Zone statute contained no jurisdictional element and its legislative history did not contain any reference to a commercial nexus. Lopez, 514 U.S. at 561. The Supreme Court rejected attempts by the government to import findings from other firearm legislation. Id. at 563. The Court reasoned that the borrowing of findings was especially inappropriate where new firearm legislation, as here, represents a sharp break from the "longstanding pattern of federal firearm legislation." Id.

Circuit Courts after Lopez have relied on the existence of a "commerce clause jurisdictional element" to reject challenges to national gun legislation. See, e.g., United States v. Hanna, 55 F.3d 1456, 1462 (9th Cir. 1995). Mr. Philip respectfully suggests that the mere presence of a "commerce clause jurisdictional element" will not salvage a criminal accusation which lacks a substantial effect on interstate commerce.

United States v. Pappadopoulos, 64 F.3d 522 (9th Cir. 1995), illustrates this point. In Pappadopoulos, the court determined that the federal arson statute was similar to the gun-free zone statute in that neither statute regulated commercial or economic

activity. The court then held that under the third category of the test, the evidence adduced by the Government failed to show a substantial effect on interstate commerce and thus reversed the defendant's conviction under the federal arson statute.

The Pappadopoulos decision provides clear guidance for the court in determining the constitutionality of § 922(g)(8). In Pappadopoulos, the residence that was burned was not used in interstate commerce. The issue, therefore, was whether the residence's destruction affected interstate commerce and the court held it did not. The comparable issue is present in this case. There is no reasonable basis for concluding that Mr. Philip's possession of weapons on May 11, 2006, affected commerce in any way any more that the house in Pappadopoulos. It is noteworthy that the unconstitutional statute in Pappadopoulos contained an express jurisdictional prerequisite of affecting commerce, just as § 922(g)(8) does. Notwithstanding, the court held that the indictment could not be sustained absent a substantial effect on commerce. Thus, the presence of a "commerce clause jurisdictional element" will not save an otherwise overreaching statute.

Because § 922(g)(8) has the same shortcomings as the ill-fated § 922(q) in Lopez, Congress exceeded its authority under the commerce clause when it enacted § 922(g)(8), and the indictment must be dismissed.

### 2. Section 922(g)(8) unconstitutionally transforms the commerce clause into a general police power

Courts have long recognized that the national government does not have general police powers. Cf. New York v. United States, 505 U.S. 144, 155 (1992) ("No one disputes the proposition that the Constitution created a Federal Government of limited powers."). Extension of the commerce clause power beyond regulation of wholly intrastate,

point-of-sale transactions unconstitutionally transforms the Commerce Clause into a general police power.

The facts of this case illustrate this point well. Anchorage police arrested Mr. Philip on May 11, 2006, based on reports of an assault or weapons misconduct at his home. The State of Alaska has alleged that Mr. Philip violated several state statutes. The State prosecution is ongoing. Using the federal commerce clause to reach this decidedly local police matter effectively and unconstitutionally transforms U.S. Const. art. I, § 8, cl. 2 into a national police power.

### IV.  CONCLUSION

For all these reasons, the indictment must be dismissed with prejudice.

DATED this 9th day of August 2006.

>Respectfully submitted,
>
>s/Sue Ellen Tatter
>Assistant Federal Defender
>Alaska Bar No. 7605057
>601 West Fifth Avenue, Suite 800
>Anchorage, AK 99501
>Phone:     907-646-3400
>Fax:       907-646-3480
>E-Mail:    sue_ellen_tatter@fd.org

Certification:

I certify that on August 9, 2006,
a copy of the ***Memorandum in Support of First Motion to Dismiss Indictment*** was served electronically on:

David A. Nesbett, Esq.

s/Sue Ellen Tatter