1          IN THE SUPERIOR COURT FOR THE STATE OF ALASKA

2                   THIRD JUDICIAL DISTRICT

3  REBEKAH RAE BAUER,           )
                                )
4           Petitioner,         )
                                )
5       vs.                     )
                                )
6  DANIEL WAYNE PHILIP,         )
                                )
7           Respondent.         )
   _____)
8  Case No. 3AN-06-00086 CI

9

10              TRANSCRIPT OF PROCEEDINGS

11         January 30, 2006 - Pages 2 through 23

12

13

14

15

16

17

18

19

20

21

22

23

24                    ORIGINAL

25

*Gaylene's Word Services*
*(907) 338-3936*

Exhibit C - Page 1 of 23

1

2

3

4

5

6

7

8

9

10        <u>DV HEARING ON MOTION FOR LONG-TERM PROTECTIVE ORDER</u>

11                     BEFORE SUZANNE COLE
                      Magistrate

12

                      Anchorage, Alaska
13                       January 30, 2006
                      11:24 o'clock a.m.
14                       Courtroom 37

15 APPEARANCES:

16      PETITIONER:               REBEKAH RAE BAUER

17

18      RESPONDENT:              DANIEL WAYNE PHILIP

19

20

21

22

23

24

25

Exhibit C - Page 2 of 23

1                P R O C E E D I N G S

2    3AN3706-15

3    [11:24:10]

4        THE COURT:  Ms. Bauer, are you pursuing a long-term

5    order?

6        MS. BAUER:  Yes, ma'am.

7        THE COURT:  And, Mr. Philip, do you oppose that order?

8        MR. PHILIP:  Yes, I do.

9        THE COURT:  Okay.  And the other people that are here are

10   witnesses or support?

11       MS. BAUER:  This is my witness.

12   Witness.

13       MR. PHILIP:  Witness.

14       THE COURT:  All witnesses?

15       UNIDENTIFIED FEMALE:  Support.

16       THE COURT:  Your support?

17       MR. PHILIP:  They're all witnesses.

18       THE COURT:  Are you a witness or support?

19       MR. PHILIP:  No.  She's tangled into it.  You'll -- it'll

20   come out.

21       THE COURT:  Let's go ahead and swear everyone in.  You

22   need to stand to be sworn in.

23       THE CLERK:  Could you raise your right hand, please?

24       (Oath administered to parties and witnesses)

25       MS. BAUER:  Yeah.


*Gaylene's Word Services*
*(907) 338-3936*                                        3


Exhibit C - Page 3 of 23

1 I do.

2   MR. PHILIP:  Yes.

3   THE CLERK:  You may be seated.  And we'll start with you,

4 ma'am.  Could you state your first name and spell your last?

5   MS. BAUER:  First name is Rebekah -- Rebekah, B-a-u-

6 e-r -- oh.

7   MS. PHELPS:  My name is Stacy Phelps, P-h-e-l-p-s.

8   THE CLERK:  And now you, ma'am.

9   MS. BAUER:  Rebekah Bauer, B-a-u-e-r.

10   THE CLERK:  And you, ma'am?

11   MS. PHILIP:  Sandra Philip, P-h-i-l-i-p.

12   THE CLERK:  You, sir?

13   MR. PHILIP:  Daniel Philip, D-a-n-i-e-l, P-h-i-l-i-p.

14   THE CLERK:  And you, ma'am?

15   MS. STEWART:  Denise Stewart, D-e-n-i-s-e, S-t-e-w-a-r-t.

16   THE CLERK:  Thank you.

17   THE COURT:  Let me hear from Ms. Bauer first.  It is her

18 burden of proof to convince me beyond a reasonable doubt that

19 you have committed a crime of domestic violence and that she's

20 currently in need of protection.  After I've heard her case,

21 you'll get a chance to ask -- I mean, to put on any evidence

22 you wish to pursue.

23   Ms. Bauer, go ahead.

24   MS. BAUER:  Daniel and I split up the end of July, early

25 August, and the police were called out to the residence when I

*Gaylene's Word Services*
*(907) 338-3936*     4

Exhibit C - Page 4 of 23

1   was getting my belongings on August 4th.  I was trying to

2   remove a TV stand, and he grabbed a hammer and told me, go

3   ahead and try to take it.  At that point, I called for a civil

4   standby so that I could just take my belongings.  At that

5   point I wanted to leave.  We left on good terms.

6        He had called me and said that he had had something of

7   mine, and I said, well, that's good, I found a couple of

8   things that belonged -- that were in the Christmas decoration

9   box, and he scheduled a time to come and pick those up from

10  me.  He never showed at my job.

11       Three weeks later, his girlfriend, Denise Stewart, showed

12  up at my job asking for the box.  I told her, I'm sorry,

13  you'll have to reschedule a different time, it's been three

14  weeks, that box is at home.  She proceeded to scream and yell

15  in front of my co-workers and in front of customers, and I

16  asked her to leave.

17       Daniel then called me again the early afternoon of

18  December 21st, and he called me at work.  That is the number

19  he's been contacting me at.  He asked me if I had had a chance

20  to mail the box to him.  I said no, things had been going on,

21  I was sorry.  And he said, can I meet you at work, and I said

22  no.  I said, not after Denise showing up at my job and acting

23  the way she did.  He assured me that nobody would be home,

24  that they were going to dinner at 6:30 that evening, and I

25  told him that I would drop the box off there.

Exhibit C - Page 5 of 23

1    I arrived at his house at about 10 after 7:00 that

2 evening.  When I got there, both vehicles were there.  I asked

3 Denise if Daniel was there.  She walked away from me.  Daniel

4 came out, we began to talk, and she interrupted.  I asked

5 Daniel to have her leave because the conversation between

6 Daniel and I doesn't involve her, she has nothing to do with

7 us.  I didn't even know her until she came to my job that day.

8    She wouldn't leave, she pushed me, it went back and

9 forth.  I asked Daniel to try to stop it.  He didn't.  I ended

10 up leaving the residence.  I called APD, they came out.  I

11 have the case number here for that.  I had tried to file a

12 restraining order against both of them.  They denied Denise's

13 stating that had Daniel not said that nobody would be home

14 that the incident between Denise and I would not have

15 happened, and that's why they put it towards him.

16    I got a phone call from him at work on the 13th of

17 January at about 2:15 in the afternoon.  As soon as I

18 recognized his voice, I said -- he asked for Rebekah, I said

19 she's not here.  I didn't want to talk to him, I didn't know

20 if I could or whatnot, so I hung up.  I called the police to

21 let them know that he had called, and that's when I got a

22 phone call from Stacey saying that he had threatened my life

23 through her.

24    THE COURT:  Who is Stacy?

25    MS. PHELPS:  I am Stacy.  He called my residence.  We

Exhibit C - Page 6 of 23

1   used to all be mutual friends.  And he called stating that he

2   could not contact Becky because he had a restraining order and

3   that if I could relay a message to her.  I said sure.  And he

4   said that he knew where she lived, that he knew where she

5   worked, he knew what she drove, and to get her on a plane and

6   out of the state.  I consider that an act of --

7           THE COURT:  And what was the date?

8           MS. PHELPS:  I have Monday, January 16, 2006,

9   approximately.

10          MS. BAUER:  It was the 13th.

11          THE COURT:  What are you referring to there?

12          MS. PHELPS:  Oh, 13th, excuse me.  To -- pardon me?

13          THE COURT:  What are you referring to?  What's the paper

14  that you're referring to?

15          MS. PHELPS:  I printed this up at home so I wouldn't

16  forget anything.

17          THE COURT:  When did you write that?

18          MS. PHELPS:  When did I?  Right after I spoke to him.  I

19  wrote it on a pad, and then I typed it up.

20          THE COURT:  And that was exactly what he said to you --

21          MS. PHELPS:  Yes.

22          THE COURT:  -- that's written there?

23          MS. PHELPS:  It is.  Do you want to --

24          THE COURT:  May I take a look at it?

25          MS. PHELPS:  Yeah.

Exhibit C - Page 7 of 23

1    THE COURT:  Thank you.

2    MS. BAUER:  Ma'am, his girlfriend has also contacted the

3  owner of my business, who called me into her office to find

4  out if I had been making phone calls to Daniel, which I had

5  not.  And her calling my job, him calling my job, that's my

6  lifelihood, that's how I take care of myself.

7    THE COURT:  Thank you.

8    Mr. Philip, what did you want to say?

9    MR. PHILIP:  Basically, back at the end of June -- in the

10  end of June, we split up, and I told her she had -- I gave her

11  30 days to take all her belongings and move out of my house.

12  Well, actually, I gave her a few days -- three days over that.

13    On 7/29 of '05, Friday, she was to meet me at 10:00 a.m.

14  at my house to pick up her stuff.  She doesn't show up till

15  11 o'clock to begin with.  She starts packing up her stuff,

16  everything's going fine, there's no problems, and within 20 to

17  30 minutes of her being there, she's moving my kids'

18  belongings out of the house, and I said you're not taking

19  that.  I said that belongs to my kids, not to you.  She says,

20  well, I paid for it.  I said no, that belongs to my kids, not

21  to you.  And I said I'll smash it with a hammer, I said I'll

22  burn it, I said I'll break it, and there won't be no reason to

23  take it out of the house, I said, because that belongs to my

24  kids, that was bought for them, and you're not leaving with

25  it.

1          And at that point, she picked up the phone, she called

2     APD, and she asked for a civil standby, which is what she was

3     supposed to do before she even got there.  And because of

4     that, she was on the phone with APD for a few minutes, and

5     then she gets off the phone with them, and she says I

6     cancelled APD.  I said you can't cancel APD.  I said you know

7     better than that, APD don't cancel, they're not a cab company.

8     And as soon as I look out the window, here comes three

9     officers coming down the road.

10          At that point, we -- I wouldn't allow them in my house.

11    I wouldn't allow -- I wouldn't come out of my house, and we

12    pretty much had a little bit of a standoff until all her stuff

13    was packed and they [sic] exited my house.  At that point

14    she'd exited my house and I had not had any contact with her,

15    period, from that point on up until the point that in October

16    I had to go cancel a cell phone service because the contract

17    ended.  That was the last point of contact that I had with

18    her.

19          And I'd also -- my car insurance was prepaid for X amount

20    of months.  Well, she cancelled me from my own car insurance

21    policy, so for the --

22          MS. BAUER:  Ma'am, no, I didn't.

23          THE COURT:  Please don't --

24          MR. PHILIP:  For the last month and a half, of October

25    through the middle of November, I drove thinking that I have

1  insurance because I already paid for it, but Ms. Bauer here

2  had cancelled it.  And I called her when I found out that my

3  insurance was cancelled.  It took 10 seconds to start

4  screaming and yelling on the phone, so I hung up and left it

5  at that.

6      She then, back in October, said she had a box with some

7  belongings that belonged to me and she wanted to return them.

8  I told her that I would either come by her work -- she asked

9  me to come by her work and pick them up.  I said fine.  When I

10 went to her work to pick them up, I had just gotten out of the

11 hospital and wasn't able to get around very well, and I had

12 asked Denise to go in.  And she didn't have to speak to

13 Rebekah, all she had to do was go to the front counter and

14 pick it up.  Well, when she went to the front counter, they

15 said it wasn't there, let me go ask Rebekah.  And when they

16 came back, Rebekah came back down and started yelling at her,

17 telling her that -- telling Denise that she needed to leave,

18 this is none of her business, this is blah-blah-blah.  And so

19 they exchanged words, she walked out -- Denise walked out the

20 door, Rebekah followed her out the door, holding the door in

21 one hand, cussing at her at her own place of employment, and

22 that was -- we just got in the truck, we left, and never

23 picked up the box.

24     On December 21st, I called her and asked were you going

25 to send that box, were you going to drop that box off, and the

Exhibit C - Page 10 of 23

1  conversation was okay, there was no arguing and yelling.  And

2  she said, well, I have things to do, and I said can I come

3  pick it up.  She says no.  I said -- she said, well, I have

4  things to do after work and I'll drop it off.  And I said,

5  okay, well, don't even -- just come drop it off, you can leave

6  it on the porch, you don't have to ring the doorbell, you

7  don't have to talk to me, just set it on the porch and drive

8  away.

9       And roughly 6:00, 6:30 p.m. on the night of the 21st,

10  Denise was just arriving back home, and she pulls in the

11  driveway, and right after -- not three seconds of pulling in

12  the driveway, Ms. Bauer pulls in and parks right behind her.

13  Denise gets out of the car, comes in the house, and says

14  there's somebody outside for you.  I go to the door, it's

15  Rebekah, she's got a box in hand, I take the box from her, and

16  at that point Denise was coming back out to her car to get

17  some stuff out, and she looks at -- she stops where I -- where

18  we were standing on the front porch and says can you tell her

19  to go away.  This is coming from Rebekah:  Can you tell Denise

20  to go away?  I said no, she lives here.  I said all you needed

21  to do is drop the box off and leave, thank you, have a nice

22  day.

23       And at that point, she looked at Denise, and Denise had

24  told her multiple times, please leave my property, leave, go

25  away, you're not welcome here, or whatever.  And she refused

Exhibit C - Page 11 of 23

1  to leave.  Every time Denise told her to leave, she'd look at

2  me like I was supposed to tell her that, no, you don't have to

3  go away or whatever.  And I said, you know, she lives here, I

4  live here, you don't live here, you need to leave.

5      And she looked at me with this dumbfounded look on her

6  face, and then she says, well, wait a second, there's

7  something in that box that's mine.  I said okay, I went like

8  this, I held the box out.  She then opened the box and grabs

9  this cell phone out of the box, shuts the box, gives me the

10  box back, she starts to walk away with the cell phone, she

11  turns around and chucks the cell phone and hit Denise square

12  in the face with the phone.  The phone hits the ground, and at

13  that point her and Denise engaged --

14      THE COURT:  Okay.  I'm going to cut you off here because

15  you understand we're not here on the assault with Denise or

16  whatever happened with Denise.  What I'm here on is you.

17      Let's get to this phone call with Ms. Phelps allegedly on

18  January 16th.  What do you say about that?

19      MR. PHILIP:  On January 16th I did call the -- the

20  residence, and Ms. Phelps answered the phone.  And I asked --

21      THE COURT:  Whose residence were you calling?

22      MS. PHELPS:  My resi --

23      MR. PHILIP:  The Phelps residence.

24      THE COURT:  Hm?

25      MR. PHILIP:  I called the Phelps residence.  First I

Exhibit C - Page 12 of 23

1  called Mr. Phelps on his phone -- on his cell phone.  He

2  didn't answer.  Left a message.  Called the home phone, she

3  answered, and within 10 seconds of speaking to her not even

4  about Ms. Bauer--I was referring to Mr. Phelps--and she

5  started screaming.  And I said I'm not even -- I don't care

6  about Becky, I don't care about Bauer, I'm -- and that's where

7  I just hung up the phone and have not made contact since.

8         THE COURT:  Now, are you telling me you didn't say that

9  you wanted her to give Becky a message, to tell her that you

10 know where she lives, you know where she works, knows what she

11 drives, told her to get her on a plane and get her out of

12 state?

13        MR. PHILIP:  No, that is not what I said.  I didn't say

14 any of that.  Rebekah --

15        THE COURT:  And how do know Ms. Phelps?

16        MR. PHILIP:  -- we've been separated -- Ms. Phelps is the

17 wife of an ex-friend.

18        THE COURT:  When did this person become an ex-friend?

19        MS. PHELPS:  When --

20        MS. BAUER:  When we split up.

21        MR. PHILIP:  Sixteen -- on the 16th of January.

22        THE COURT:  Prior to that, you were all friends.

23        MR. PHILIP:  We were friends but on low speaking terms.

24        THE COURT:  How long have you known them?

25        MR. PHILIP:  Ms. Phelps, since 2002.

*Gaylene's Word Services*
*(907) 338-3936*                                              13

Exhibit C - Page 13 of 23

1        THE COURT:  And Mr. Phelps?

2        MR. PHILIP:  Since grade school.

3        THE COURT:  What is it your witnesses would tell me?

4        MR. PHILIP:  They could tell you that I've never hit a

5   female, period.  I've never laid a hand on her.  I have never

6   caused anything to her to have a restraining order put on me.

7   And all of a sudden she goes out and puts a restraining order

8   on me.

9        THE COURT:  Were they present on -- either of them

10  present on this occasion, August 4th, 2005?

11        MR. PHILIP:  August 4th?

12        THE COURT:  The day that Ms. Bauer was moving.

13        MR. PHILIP:  She -- she was on Ms. -- Denise was on the

14  phone, and my other witness was not present.

15        THE COURT:  Okay.

16        MR. PHILIP:  I do have a telephone -- telephonic

17  witnesses that were present.  My aunt was there.  I have a

18  whole house -- I had an entire circle -- I live at the bottom

19  of a court, and I -- my entire court was standing out in their

20  circle watching as there's --

21        THE COURT:  And where are these witnesses now?

22        MR. PHILIP:  Or, actually, ma'am, I'm sorry, I do have

23  one witness here that was there that day.

24        THE COURT:  Who is that?

25        MR. PHILIP:  Mr. Eisen (ph).

1          THE COURT:  And where was he?

2          MR. PHILIP:  He was down in the -- in the cul-de-sac with

3    everybody else.

4          THE COURT:  So would he be able --

5          MR. PHILIP:  He'd -- he'd already been in my house and

6    back out.  He's -- he's a friend that --

7          THE COURT:  So is he going to be able to testify to this

8    conversation about the TV stand?

9          MR. PHILIP:  Yeah.

10          THE COURT:  Bring him up.

11          MR. PHILIP:  Mr. Eisen?

12          MS. BAUER:  Ma'am?

13          THE COURT:  Uh-huh (affirmative).

14          MS. BAUER:  Ma'am, Brian Eisen was not there in the house

15    when that happened, and actually John Gray (ph)

16    (indiscernible) here and helped me move my belongings out of

17    the house as well.

18          THE COURT:  So he was there for this as well.

19          MR. PHILIP:  Mr. Gray showed up roughly an hour --

20          THE COURT:  I'm not going to hear from either witness.

21          Regarding the phone call on January 16th, was anyone

22    there listening on the phone?

23          MS. PHELPS:  No.

24          MS. STEWART:  I was.

25          UNIDENTIFIED SPEAKER:  (Indiscernible) --

*Gaylene's Word Services*
*(907) 338-3936*                                            15

Exhibit C - Page 15 of 23

1      THE COURT:  I'm not hearing it.  Thank you anyway, sir.

2      MR. PHILIP:  Denise was -- was there present at that

3  time.

4      THE COURT:  On the phone?

5      MR. PHILIP:  No, I was on the phone and she was present

6  in the room at that time when the conversation took place.

7      THE COURT:  Mr. Philip, I'll give you a chance to look at

8  this if you like.

9      Ms. Bauer, anything else?

10     MS. BAUER:  I just -- the phone calls need to stop.  He

11  wanted this done.  I stopped calling him and left him alone.

12  There's no reason to call my job, there's no reason to call

13  and threaten me, there's no reason to tell me he's not going

14  to be home just so that his girlfriend can walk outside and

15  beat me up.

16     THE COURT:  We're not here on the incident with

17  Ms. Stewart.

18     MS. BAUER:  Right, right.

19     THE COURT:  I'm not addressing that in any way.  The only

20  thing that I am addressing here is basically it's these two

21  incidents, since there's no allegations of prior domestic

22  violence, that is, what occurred on August 4th involving the

23  dispute over property --

24     MR. PHILIP:  What --

25     THE COURT:  Frankly, when a relationship ends, it is my

Exhibit C - Page 16 of 23

1   position that things can get quite heated.  And when it gets

2   to a dispute over property, I don't think that's grounds for a

3   domestic violence protective order, normally.  I think, that

4   is, in the heat of the moment, it's a dispute over property.

5   As long as it doesn't get physical, I think it's open to

6   interpretation whether there have been threats made or -- or

7   what exactly occurred.  If that were the only incident, I

8   would deny this in a heartbeat.

9        However, I was convinced by Ms. Phelps.  I don't believe

10  that that was the only incident.  I don't believe Mr. Philip's

11  testimony that he didn't make these statements to Ms. Phelps,

12  although it is quite clear to me that Ms. Phelps is here with

13  Ms. Bauer.  There is certainly some bias that attaches to

14  that, I grant you that, but I also find that Ms. Phelps has

15  known Mr. Philip.  She indicated she didn't want him to get

16  into trouble.  He knows her -- apparently her husband has

17  known him for many years.  I just don't believe that she would

18  come into court and lie in order to do something to help

19  Ms. Bauer.

20       And, frankly, the fact that by the testimony she wrote

21  this down in great detail immediately after the phone call,

22  I'm convinced by it.  I think that phone call occurred.  It

23  may, again, have been in the heat of the moment, but I do find

24  that it suggests that the actions on the 4th and 5th, then,

25  are more threatening than Mr. Philip wishes to acknowledge.

Exhibit C - Page 17 of 23

1        I'm granting the request for the order.  Any changes,

2   Ms. Bauer, to the way the order was written for you on

3   January 10th?

4        MS. BAUER:  No, ma'am.

5        THE COURT:  Mr. Philip, any changes to the order itself?

6        MR. PHILIP:  I don't agree with it, period.  I mean --

7        THE COURT:  I understand that, but do you want any

8   changes to the provisions of the order?

9        MR. PHILIP:  What are the provisions?

10       THE COURT:  No contact.

11       MR. PHILIP:  I don't want any contact with her, but on

12  the same note as her -- as me supposedly calling her place of

13  employment, she can't continue to call my cell phone.

14       THE COURT:  Okay.

15       MR. PHILIP:  She can't -- I -- I can --

16       THE COURT:  Sir, that -- this is not an order against

17  her.  If you feel that she's committed a crime of domestic

18  violence against you, you have to file for your own order.  If

19  she continues to call your cell phone and you have proof of

20  that, then --

21       MR. PHILIP:  What --

22       THE COURT:  -- that might be coercion, which is trying to

23  get you to break your order, in which case you should bring

24  proof of that to court.

25       MR. PHILIP:  Okay.

*Gaylene's Word Services*
*(907) 338-3936*

18

Exhibit C - Page 18 of 23

1   THE COURT:  But at this point --

2   MR. PHILIP:  One --

3   THE COURT:  -- I'm not entering an order against her.

4   MR. PHILIP:  Okay.  I do have one thing I -- I wish to

5 change on the provisions.

6   THE COURT:  What's that?

7   MR. PHILIP:  I'm a tow driver, I drive a tow truck.  We

8 do drop cars at Trailer Craft, which is her place of

9 employment, and I can't be within 200 feet of her or her place

10 of employment or residency, so how am I supposed to my job?

11   THE COURT:  You are not to be within 500 feet of her

12 residence.

13   MR. PHILIP:  My -- mine because --

14   THE COURT:  You are not to have any direct contact with

15 her.  Incidental contact, meaning you're not having any

16 contact with her, you're dropping something somewhere at her

17 employment and --

18   MR. PHILIP:  I have to go in.  I -- I drop cars in the

19 back.  I got to go in the front.  She's at the front counter.

20   THE COURT:  Do you agree with that?

21   MS. BAUER:  Ma'am, no, I do not.

22   THE COURT:  What do you --

23   MS. BAUER:  I am upstairs on the second floor.  When

24 belongings -- when vehicles are brought in--because I have --

25 I have run into his ex-employer there--they go -- they deal

*Gaylene's Word Services*
*(907) 338-3936*            19

Exhibit C - Page 19 of 23

1  strictly with the service department.  I'm upstairs, I'm not

2  there.  I have -- I have yet to see Daniel working since we

3  split up.

4      THE COURT:  I'm going to enter a caveat to the order--can

5  I see this for a second--saying that there is to be no contact

6  with her place of employment except only as necessary for his

7  own employment, period.

8      (Whispered conversation)

9      THE COURT:  Ms. Bauer, you'll be able to come up here in

10  just a moment.

11      MR. PHILIP:  Can you -- can I make a request for

12  Ms. Phelps and Ms. Bauer to leave all of my family alone?

13      THE COURT:  No.

14      MR. PHILIP:  Do not call any of my family?

15      THE COURT:  I'm not entering any orders against anyone

16  else here.

17      MS. PHILIP:  Your Honor?

18      THE COURT:  You are?

19      MS. PHILIP:  I'm Daniel's mother.

20      THE COURT:  Uh-huh (affirmative).

21      MS. PHILIP:  I have two grandchildren that were involved

22  in this prior to them separating that are totally terrified of

23  her.  Now, I'm not saying --

24      THE COURT:  And you -- if there's --

25      MS. PHILIP:  -- take my word for it.

Exhibit C - Page 20 of 23

1      THE COURT:  Okay.  I tried to explain this.

2      MS. PHILIP:  They would cry not to go home.

3      THE COURT:  This is not an order against him.  This is

4  only an order against Mr. Philip.  So if you feel that she's

5  committed a crime of domestic violence and you all need

6  protection from her, then you need to file your own case.

7      MS. PHILIP:  No, I don't need protection from her.

8      THE COURT:  Well, whoever needs protection, you file your

9  case.  This is not that case.  This is only her case.

10     MS. PHILIP:  Okay.  I'm going to step out of here

11 because (indiscernible) --

12     (Whispered conversation)

13     MR. PHILIP:  That's what I tried explaining to her.  You

14 know what?  Fuck this, let's go.  Come on, let's go.

15     UNIDENTIFIED OFFICER:  (Indiscernible) back in

16 (indiscernible), sir.  You're not getting (indiscernible).

17     MR. PHILIP:  You ain't (indiscernible).

18     UNIDENTIFIED OFFICER:  Sir, you need to stand by to get

19 your order.

20     MR. PHILIP:  I ain't got no orders.

21     THE COURT:  Officer Sandvik (ph), would you mind?

22     OFFICER SANDVIK (PH):  I'll get it, yeah.

23     THE COURT:  Mr. Philip?

24     UNIDENTIFIED OFFICER:  Mr. Philips, that's not a request.

25 Step over there and get your order.

*Gaylene's Word Services*
*(907) 338-3936*                                    21

Exhibit C - Page 21 of 23

1    UNIDENTIFIED SPEAKER:  Take it easy, Daniel.  Only got to

2  chill, brother.  It's all good.

3    THE COURT:  That's your order right there.  Thank you.

4  Mr. Philip is now served.

5    UNIDENTIFIED SPEAKER:  (Indiscernible) note, he tore up

6  his order before he left the area.

7    THE COURT:  Yeah.

8    UNIDENTIFIED SPEAKER:  (Indiscernible).

9    THE COURT:  The record will show that he has been served.

10    (Whispered conversation)

11  [11:47:19]

12                        END OF PROCEEDING

13

14

15

16

17

18

19

20

21

22

23

24

25

Exhibit C - Page 22 of 23

1                    TRANSCRIBER'S CERTIFICATE

2        I, M. GAYLENE LARRECOU, do hereby certify:

3        That the foregoing pages 1 through 23 contain a full,

4    true, and correct transcript of the proceedings in the

5    above-entitled action; that due to the quality of the

6    recording and/or duplication, there are indiscernibles that

7    cannot be resolved; and that the transcription was performed

8    by me to the best of my knowledge and ability from the audio

9    recording.

10

11    _____        7-27-06
      M. GAYLENE LARRECOU                        Date
12    Court Reporter/Transcriber
      Alaska Court System Certified
13    United States Court Approved
      AAERT Certificate 00285

14

15

16

17

18

19

20

21

22

23

24

25

Exhibit C - Page 23 of 23